# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 13, 2025        Decided May 16, 2025

No. 21-1042

VILLAGE OF MORRISVILLE, VERMONT,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

VERMONT AGENCY OF NATURAL RESOURCES,
INTERVENOR

———

Consolidated with 21-1109

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Paul V. Nolan* argued the cause for petitioner. With him on the briefs was *Carolyn Elefant*.

*Matthew R. Christiansen*, General Counsel, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Robert H. Solomon*,

Solicitor, and *Scott Ray Ediger*, Attorney. *Jared B. Fish*, Attorney, Federal Energy Regulatory Commission, entered an appearance.

*Laura Bucher Murphy*, Assistant Attorney General, Office of the Attorney General for the State of Vermont, argued the cause and filed the brief for intervenor for respondent.

*Christophe Courchesne* was on the brief for *amici curiae* American Whitewater, et al. in support of respondent.

Before: WILKINS and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Pursuant to the Federal Power Act, the Federal Energy Regulatory Commission ("FERC" or "Commission") issues licenses to parties who propose to construct and operate hydroelectric projects. 16 U.S.C. § 797(e). The licenses may range between 30 and 50 years. *Id.* § 808(e). When a proposed hydroelectric project may result in a discharge into navigable waters, the applicant must also obtain a water quality certification from the State in which the discharge will originate. 33 U.S.C. § 1341(a)(1) ("Section 401"). State certifications may also attach conditions to the project's operation. *Id.* § 1341(d). If the State fails or refuses to act on an applicant's request for certification within a reasonable period of time (not to exceed one year), the certification requirements are waived. *Id.* § 1341(a)(1). However, FERC will not issue a license until the required state certification has been obtained or has been waived. *Id.*

3

Determining whether a proposed hydroelectric project complies with applicable environmental standards can be an iterative and time-consuming process. As a result, States occasionally allow applicants to withdraw and resubmit their certification applications in order to reset the one-year statutory clock. This practice allows applicants to supplement their applications or revise proposals for environmental viability in the process of seeking state certifications.

When a party seeks to renew a license, the established hydroelectric project may continue to operate under interim annual federal licenses that extend the terms of the original license while the state certification process is pending. *See* 16 U.S.C. § 808(a)(1); 18 C.F.R. § 16.18. As a result, during the process of renewal, the withdrawal-and-resubmission practice can create perverse incentives. This is because parties seeking to renew a license may have an incentive to indefinitely delay state certification so as to avoid having to satisfy more stringent environmental standards that were adopted after the original license and state certification were issued. And States likewise may wish to avoid more stringent federal regulation.

We addressed the withdrawal-and-resubmission issue in *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019). The court held that when a State and an applicant enter into an agreement allowing the applicant to withdraw and resubmit solely with the intention of delaying certification, this "usurp[s] FERC's control over whether and when a federal license will issue." *Id.* at 1104. The court thus held that such "deliberate and contractual idleness" will be viewed as a waiver of the State's statutory certification authority. *Id.* at 1104-05.

In the cases now before the court, Petitioner Village of Morrisville, Vermont ("Morrisville") sought to renew its federal license to operate a hydroelectric project in the

Lamoille River Basin, which has been in operation since 1981. After lengthy discussions with the Vermont Agency of Natural Resources ("Vermont") that involved two rounds of revisions and additional data, Vermont issued Morrisville a conditional water certification for the project. Dissatisfied with the State's certification conditions, Morrisville now seeks to nullify them by contending that Vermont waived its statutory certification authority when it allowed Morrisville to twice withdraw and resubmit its application.

We deny Morrisville's petitions for review. The record in this case makes it clear that Morrisville *unilaterally* withdrew and resubmitted its application to buy itself time to negotiate more favorable conditions with the State. This is vastly different from the situation that we faced in *Hoopa Valley*. In these circumstances, we conclude that the State did not waive its statutory certification authority.

## I.    BACKGROUND

### A.  Section 401 of the Clean Water Act

Two intertwining statutes regulate the licensing of hydroelectric projects in the United States. Under the Federal Power Act, parties must obtain a license from FERC. 16 U.S.C. § 817(1). Once the original term of a license expires, parties must petition the Commission for a license renewal. *See id.* § 808(a). As noted above, however, interim annual licenses allow parties seeking license renewal to continue operating under the original license's terms while their applications for relicensing are pending. *Id.* § 808(a)(1); 18 C.F.R. § 16.18.

If a proposed hydroelectric project may result in water pollution discharges, it must further comply with the licensing scheme established by the Clean Water Act, which "protect[s]

the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" occurring within their boundaries. 33 U.S.C. § 1251(b); *see also Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 971 (D.C. Cir. 2011) (observing that the Clean Water Act "reinforc[ed] the role of States as the prime bulwark in the effort to abate water pollution" (citation and internal quotation marks omitted)); *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 386 (2006) (describing this statutory framework as "a system that respects the States' concerns" over water pollution).

Reflecting this allocation of responsibilities, section 401 of the Clean Water Act requires the input of States where projects are located before FERC can issue or renew a federal license. Specifically, the statute mandates that an applicant for a federal license whose project "may result in any discharge into the navigable waters" must first "provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate" certifying that the project will comply with certain federal and state environmental requirements. 33 U.S.C. § 1341(a)(1), (d). Where a State denies a water quality certification, no federal license or permit shall be granted. *Id.* § 1341(a)(1). And if a State issues a conditional certification that imposes operational limitations on the project, such as "effluent limitations" and "monitoring requirements," these requirements "shall become a condition on any Federal license or permit." *Id.* § 1341(d).

Because the state water quality certification is a prerequisite for a federal license, Congress sought to "prevent a State from indefinitely delaying a federal licensing proceeding." *Hoopa Valley*, 913 F.3d at 1104-05 (internal citations omitted). This "time limitation was meant to ensure that 'sheer inactivity by the State . . . will not frustrate the Federal application,'" which "would occur if the State's

inaction, or incomplete action, were to cause the federal agency to delay its licensing proceeding." *Alcoa Power*, 643 F.3d at 972 (alteration in original) (quoting H.R. REP. NO. 91-940, at 55 (1970)). To this end, the statute provides that

> [i]f the State . . . fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application.

33 U.S.C. § 1341(a)(1).

In implementing the statute, the Commission requires that federal license applicants provide either a copy of the water quality certification, a copy of the dated request for such certification, or "[e]vidence of waiver." 18 C.F.R. § 5.23(b)(1) (2003). A certification is considered waived, the Commission explains, when "the certifying agency has not denied . . . or granted certification by one year after the date the certifying agency received a written request for certification." *Id.* § 5.23(b)(2). In other words, "if [a State] agency does not grant, grant with conditions, deny, or expressly waive water quality certification within one year of receiving a certification application, the agency has waived its authority to do so." *Tower Kleber Ltd. P'ship*, 186 FERC ¶ 61,149, at P 21 (2024).

## B. *Withdrawals and Resubmissions of Requests for State Certifications*

The statutory one-year time limit on state certifications may pose problems because certifying environmental compliance is often a lengthy process that can take much longer than one year. States often have stringent environmental standards that

require applicants to conduct studies and collect new data on the environmental impact of new projects. *See, e.g.*, *Turlock Irrigation Dist. v. FERC* ("*Turlock II*"), 36 F.4th 1179, 1181 (D.C. Cir. 2022) (describing California's requirement that applicants must follow a separate process under the California Environmental Quality Act); *N.C. Dep't of Env't Quality v. FERC*, 3 F.4th 655, 662, 669 (4th Cir. 2021) (discussing North Carolina's requirement that applicants submit a water quality monitoring plan); *Brookfield White Pine Hydro LLC v. FERC*, No. 23-1075, 2024 WL 3311809, at \*2 (D.C. Cir. July 5, 2024) (per curiam) (discussing Maine's process of water certification which prompted additional data regarding safe fish passage); *Tower Kleber Ltd. P'ship*, 186 FERC ¶ 61,149, at P 3 (describing applicant's supplementation of Michigan certification application with results of a fish study).

The need for supplemental data typically applies to both new licenses and renewals. When a license is up for renewal, the required data needed to support a state certification usually have not been collected since the last license was issued—often decades prior and presumably under "far fewer environmental conditions than are required under current federal law." *Turlock II*, 36 F.4th at 1183 n.6; *see also Cal. State Water Res. Control Bd. v. FERC*, 43 F.4th 920, 924 (9th Cir. 2022), *cert. denied sub nom. Nev. Irrigation Dist. v. Cal. State Water Res. Control Bd.*, 143 S. Ct. 2459 (2023).

Because applicants often need more time to collect environmental data, States sometimes face a "Hobson's choice" between "granting certification without necessary information or waiving [their] power" to issue certifications under the statute. *Turlock II*, 36 F.4th at 1184 (cleaned up). One solution to this dilemma is to deny the certification without prejudice, giving the applicant more time to conduct the necessary additional studies before they re-file. *See id.* at 1181.

Another solution is to allow the applicant to withdraw and resubmit the certification request. This, in theory, should reset the one-year clock in section 401. *See Cal. State Water*, 43 F.4th at 925-26 (explaining the prevalence of this withdrawal-and-submission practice among multiple states "over the last several decades"). This practice gives applicants more time to review and supplement their certification applications rather than incurring denial without prejudice for failure to provide information that may be laborious to collect.

Despite some "misgivings," the Commission initially appeared to accept this withdrawal-and-resubmission approach as consistent with the statute. *Id.* (collecting administrative decisions). But in *Hoopa Valley*, we rejected this workaround when the States of California and Oregon entered into a written agreement for repeated withdrawals and resubmissions for the same application "for more than a decade." 913 F.3d at 1105. Given Congress's express intent to prevent States from frustrating the federal licensing process through "dalliance" or "delay," we held that such a coordinated scheme did not reset the clock under section 401. *Id.* at 1101, 1104 (quoting 115 CONG. REC. 9264 (1969)). Instead, we found that such "deliberate and contractual idleness" constituted waiver of the States' certification authority. *Id.* at 1104-05.

Since *Hoopa Valley*, the Commission has adopted a similar approach where the record indicates a coordinated scheme or agreement between the applicant and the State agency to delay the certification process. *See, e.g.*, *Placer Cnty. Water Agency*, 169 FERC ¶ 61,046, at PP 17-18 (2019) (finding waiver where California "explicitly request[ed] withdrawal and resubmission" from the applicant over a five-year period); *N.Y. State Dep't of Env't Conservation v. FERC*, 991 F.3d 439 (2d Cir. 2021) (affirming FERC order finding waiver where New

York had asked the applicant to stipulate to a different receipt date to circumvent the one-year deadline).

But the Commission, as well as two of our sister circuits, have distinguished *Hoopa Valley* to uphold withdrawals and resubmissions where there was no evidence of coordination with the State, and only the applicant's unilateral requests for additional time. *See Cal. State Water*, 43 F.4th at 932-36; *N.C. Dep't of Env't Quality*, 3 F.4th at 671-76; *see also KEI (Maine) Power Mgmt. (III) LLC*, 173 FERC ¶ 61,069, at P 42 (2020) (finding that petitioner's withdrawals and resubmissions that were unilateral and in its own interest, rather than "at the behest of the state," did not constitute waiver).

## C. Facts

Petitioner Morrisville, a village in north-central Vermont, has operated a hydroelectric project in the Lamoille River Basin since obtaining a 35-year federal license in 1981. The project consists of four developments: Green River, Lake Elmore, Morrisville, and Cadys Falls. With its license set to expire in 2015, Morrisville filed an application for a new federal license with the Commission in April 2013.

In December 2013, after the Commission issued a public notice of the license renewal application and solicited comments, the Vermont Agency of Natural Resources published comments noting that the relicensing would need to address specific environmental and water management concerns. The State emphasized three potential issues with the project: bypass flows to support aquatic habitats in Morrisville and Cadys Falls, conservation flow management in Green River, and water level management of the Green River reservoir and Lake Elmore. Vermont then proposed environmental recommendations for addressing these matters

that were significantly stricter than those planned by Morrisville at the time.

Shortly thereafter, in January 2014, Morrisville filed an application for a water quality certification with Vermont. After acknowledging receipt of the certification request, Vermont asked Morrisville for additional information. Providing the requested information would require additional tests, however. In light of Vermont's prior indications that it would impose conditions on the project absent certain modifications, Morrisville and Vermont then engaged in months-long discussions to address the State's concerns, including the collection of additional data and studies provided by both parties. After this round of discussions, Morrisville produced a revised proposal in October 2014. While the parties continued to discuss, Morrisville then withdrew and resubmitted its application for the certification on two separate occasions.

First, in early November 2014, Morrisville wrote to Vermont withdrawing and resubmitting its application, explaining that it was doing so "[t]o accommodate [Vermont's] review of Morrisville's various proposals, including its recently submitted phase-in proposal" from a week prior. Letter from Craig Myotte, Morrisville Water & Light Dep't, to Peter LaFlamme, Director, Vt. Dep't of Env't Conservation (Nov. 7, 2014), J.A. 292. Morrisville contends that it did so at Vermont's request, relying on internal correspondence discussing a suggestion to withdraw and resubmit that came from state officials. The record also shows that Morrisville internally weighed the costs and benefits of withdrawing and resubmitting, including the likelihood that Vermont would issue a water certification imposing onerous conditions on the relicensed project absent additional discussions.

In the months that followed, Vermont reached out to Morrisville once again requesting additional information, and the parties continued to discuss the project. After these additional discussions, Morrisville then made its second withdrawal and resubmission in September 2015, expressing that it needed more time to review new reports and to provide additional information, and that Morrisville's trustees had asked for new cost estimates that it needed time to provide to them. Vermont eventually acquiesced to this second extension on the condition that Morrisville ultimately implement Vermont's bypass flow recommendations. Vermont further stated that it would not allow extensions beyond December 2015, and that Morrisville needed to provide a firm timeline for its completion of its outstanding tasks during that additional period. Morrisville then again withdrew and resubmitted its application, asking Vermont to consider, as a renewed application, all the additional proposals and data filed since the second certification request.

Less than a year later, Vermont then issued a conditional certification. Among the conditions imposed was that the Green River Development's reservoir must be maintained above 1218.5 feet mean sea level at all times. This condition prompted FERC to request that Morrisville conduct additional engineering studies on the effects of this limitation on the Green River Development's dam. Unhappy with the conditions and with the need to conduct even more additional studies, Morrisville litigated the certification in Vermont state court, with the Vermont Supreme Court affirming the relevant conditions. *See In re Morrisville Hydroelectric Project Water Quality*, 224 A.3d 473, 476 (Vt. 2019). In view of this decision, FERC reiterated the need for the additional studies.

### D. Procedural History

After exhausting its challenges to the conditions on the merits, Morrisville then filed the petitions at issue here, alleging that Vermont had waived its statutory right to issue any conditions by allowing Morrisville to withdraw and resubmit its application. Contending that a scheme to delay the certification process existed here as in *Hoopa Valley*, Morrisville asked FERC to set aside the water quality certification – and the conditions it imposed – as waived under section 401.

The Commission denied Morrisville's petition, issuing a declaratory order finding that there had been no waiver. After denying rehearing of this order by operation of law, the Commission elaborated that *Hoopa Valley* was concerned with the motivations of the parties, and that waiver required either evidence of coordinated and "deliberate . . . idleness," or that the State had requested withdrawal and resubmission "with the motivation" to reset the clock, neither of which was demonstrated here. Order Addressing Arguments Raised on Rehearing, 174 FERC ¶ 61,141, at P 12 (Feb. 24, 2021), J.A. 22-23.

Instead, FERC found that Morrisville had withdrawn and resubmitted its application "unilaterally and in its own interest," rather than "at the behest of the state." *Id.* The Commission further found that the correspondence Morrisville had submitted as evidence of coordination only showed Morrisville's internal motivations to obtain more favorable conditions. It therefore declined to find waiver.

Morrisville then filed this appeal, alleging that the Commission's conclusions were not supported by substantial

evidence and that the order should be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## II.    ANALYSIS

### A.  Standard of Review

We set aside FERC orders under the Administrative Procedure Act if we determine that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under 16 U.S.C. § 825*l*(b), we accept the Commission's findings of fact where they are supported by substantial evidence. We therefore uphold the Commission's factual determinations if we "find that the evidence on which the finding is based is substantial." *Turlock Irrigation Dist. v. FERC* ("*Turlock I*"), 786 F.3d 18, 28 (D.C. Cir. 2015). Although this standard "requires more than a scintilla" of evidence, it "can be satisfied by something less than a preponderance of the evidence." *Id.* Meanwhile, questions of law, such as what constitutes waiver under section 401, are reviewed *de novo. See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 & n.4 (2024).

### B.  Standing

Before we reach the merits, we must first address the threshold question of whether Morrisville has satisfied Article III standing. *California v. Texas*, 593 U.S. 659, 668 (2021). While the Federal Power Act vests this court with jurisdiction to review petitions by parties "aggrieved" by final Commission orders, 16 U.S.C. § 825*l*(b), a "party is 'aggrieved' only if it has Article III standing." *Orangeburg v. FERC*, 862 F.3d 1071, 1077 (D.C. Cir. 2017). To satisfy this constitutional requirement, a petitioner must demonstrate that it has suffered an injury in fact that is "fairly traceable to the defendant's

allegedly unlawful conduct and likely to be redressed by the requested relief." *California*, 593 U.S. at 668-69 (internal quotation marks omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Vermont charges that Morrisville lacks standing because the injury it alleges stems from the certification's conditions, and thus would not be redressed by the remedy it seeks – namely, a decision from this court setting aside FERC's conclusion that Vermont did not waive the certification. *See Marino v. Nat'l Oceanic & Atmospheric Admin.*, 33 F.4th 593, 596 (D.C. Cir. 2022) ("To establish redressability, a plaintiff must prove 'a likelihood that the requested relief will redress the alleged injury.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998))). According to Vermont, a finding of waiver would only redress any injury caused by a State's *delay* in issuing the certification, rather than harm flowing from conditions imposed in a certification issued after the statutory period. Because Morrisville does not allege that it was harmed by any delay, Vermont argues, there is no sufficient nexus between the injury here and the remedy sought.

We disagree. While a section 401 waiver is not the original cause of the harmful conditions, Vermont's argument ignores an intervening cause of Morrisville's current injury: the FERC order and a subsequent directive requiring Morrisville to comply with the certification's conditions, including that it conduct additional engineering studies in connection with its current licensing application. Because Morrisville's current injury is therefore not the waiver or delay, but FERC's requirement that it act in light of the certification's conditions, it has standing to request that we set that requirement aside.

As we have explained, where a party has "go[ne] directly to FERC and present[ed] evidence of [section 401] waiver," FERC's decision "declin[ing] to find waiver" is itself the injury the petitioner seeks to redress. *Millennium Pipeline Co. v. Seggos*, 860 F.3d 696, 701 (D.C. Cir. 2017) (noting that parties may "immediately appeal any adverse FERC decision on the waiver question to this Court" because they would be "aggrieved" by FERC's order under section 19(b) of the Natural Gas Act). A finding of waiver would dissolve Morrisville's obligation to produce additional studies and otherwise comply with the certification's conditions.

Vermont relies on our decision in *Weaver's Cove Energy, LLC v. Rhode Island Dep't of Environmental Management*, 524 F.3d 1330 (D.C. Cir. 2008), a case under the Natural Gas Act. *Weaver's Cove* held that the delay of a section 401 certification, on its own, was insufficient for standing on direct review where the petitioner sued the State agency to obtain waiver but did not "claim to have been injured by" the delay in question. *Id.* at 1333. Instead, we explained, a petitioner would have to wait until the State issued a final decision on the certification and then petition the federal agency to recognize that the decision was void due to waiver. *Id.* "If the [agency] disagrees," we clarified, "then [petitioner] may challenge its decision in court." *Id.*

This is precisely the posture here. That Morrisville ultimately seeks to challenge a conditional certification, rather than a certification denial, makes no difference. Ultimately, where an agency's order requires the petitioner to act – especially to take additional action – in light of the certification's conditions, its injuries "are directly traceable to the Commission's order[]" and will be remedied should this court reject the Commission's conclusion that the certification was not waived. *City of Oberlin v. FERC*, 937 F.3d 599, 604-05

(D.C. Cir. 2019); *see also Turlock II*, 36 F.4th at 1182-83 (without addressing standing, reviewing FERC order declining to find section 401 waiver). For this reason, we conclude that Morrisville has standing to challenge FERC's order.

### C. Vermont Did Not Waive Its Section 401 Certification Authority

In *Hoopa Valley*, we held that a State waives its section 401 certification authority when, "pursuant to an agreement between the State and applicant, an applicant repeatedly withdraws-and-resubmits its request for water quality certification" for longer than the statutory permissible period of one year. 913 F.3d at 1103, 1105. The question before us is whether Morrisville withdrew and resubmitted its application "pursuant to an agreement" with Vermont. *Id.* at 1103. We agree with the Commission that the record contains no evidence of such an agreement, and affirm the Commission's conclusion that Vermont did not waive its section 401 authority. *See* 16 U.S.C. § 825*l*(b); *Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557 (D.C. Cir. 2022). We thus hold that where a party unilaterally withdraws and resubmits its certification application, those actions outside of the State's control do not waive its statutory authority.

*Hoopa Valley* was "a very narrow decision flowing from a fairly egregious set of facts." *N.C. Dep't of Env't Quality*, 3 F.4th at 669. The record in this case is quite different. First, *Hoopa Valley* involved a written agreement between two States and an applicant with the express intent of "circumvent[ing]" section 401's one-year limitations period in connection with the partial relicensing of a dam. 913 F.3d at 1104. Second, pursuant to this agreement, the applicant there withdrew and resubmitted the same certification request "*for more than a decade*" to reset the statutory period. *Id.*; *see also Turlock II*,

36 F.4th at 1183 (distinguishing *Hoopa Valley* as "a case in which 'the state agencies and the license applicant entered into a written agreement . . . to *take no action at all* on the applicant's § 401 certification request'" (quoting *N.C. Dep't of Env't Quality*, 3 F.4th at 669)).

*Hoopa Valley* therefore did not address a scenario where an applicant might "withdr[aw] its request and submit[] a wholly new one in its place," and declined to determine what makes a new request sufficiently different so that it can permissibly restart the clock. *Hoopa Valley*, 913 F.3d at 1104; *see also Turlock II*, 36 F.4th at 1183. Because FERC did not base its decision on this distinction, and because we can easily conclude that there was no agreement with the State agency in this case, we also have no occasion to reach this question here. *Entergy Ark., LLC v. FERC*, 40 F.4th 689, 700 n.5 (D.C. Cir. 2022) ("[A] court's review of an agency order is limited to the grounds upon which the agency itself based its action.").

Morrisville has indeed provided evidence of *its* need for additional time so that it could address Vermont's requests for supplemental information and to negotiate with the State in order to obtain more favorable certification conditions. But it puts forth no evidence of any mutual agreement, contractual or functional, to circumvent the statutory deadline and delay the certification process. *See Placer Cnty.*, 169 FERC ¶ 61,046, at PP 23-24 (applying *Hoopa Valley* and finding waiver where the parties reached an unwritten, functional agreement to delay the certification process).

As the Commission observed below, evidence of the State's decision to delay was central to our holding in *Hoopa Valley*. *See Hoopa Valley*, 913 F.3d at 1104 (noting that Congress sought to "curb a *state's* 'dalliance or unreasonable delay,'" by enacting the one-year limitation (quoting 115

CONG. REC. 9264 (1969))). Here, however, it was *Morrisville* who sought to buy itself more time and who stood to benefit from the delay, not the State agency. *See Turlock II*, 36 F.4th at 1183 n.6. Both withdrawals and resubmissions here came at Morrisville's request, first to afford the State agency time to review the revised proposal it produced ten months after its initial submission, and then so that Morrisville could have additional time to, *inter alia*, provide an analysis to its own trustees. Vermont also only reluctantly agreed to Morrisville's second request after it made clear that the extension was conditional on a firm timeline for the completion of Morrisville's revisions.

Even if the first extension request was induced by advice from the State that the best course of action might be to withdraw and resubmit, Morrisville does not offer evidence that the State's motivation behind this advice was to give itself more time or to delay the certification process. Moreover, the record amply supports FERC's conclusion that the State permitted Morrisville's withdrawal and resubmission as an alternative to either denying its request for certification without prejudice or granting it subject to conditions that Morrisville hoped to avoid. This hardly suggests that the State was engaged in a scheme to "circumvent" the statutory deadline. *Hoopa Valley*, 913 F.3d at 1104.

This is not enough to establish section 401 waiver. Where an applicant unilaterally withdraws and resubmits its application because *it* needs more time to provide the information the State agency requires, such withdrawal and resubmission does not occur pursuant to an agreement with the State solely because the State allows the applicant to do so. *See Cal. State Water*, 43 F.4th at 935; *KEI (Maine) Power Mgmt. (III)*, 173 FERC ¶ 61,069, at P 42 (noting that where a withdrawal and refiling was prompted by the individual

applicant's desire to "avoid receiving a certification with conditions to which it objected and . . . to allow it to negotiate further to achieve an outcome to its liking," such conduct "cannot be blamed on the state").

Section 401 penalizes States that "fail[] or refuse[] to act on a request for certification" within one year. 33 U.S.C. § 1341(a); *see also Alcoa Power*, 643 F.3d at 972 ("[T]he purpose of the waiver provision is to prevent a State from indefinitely delaying a federal licensing proceeding by failing to issue a timely water quality certification under Section 401."). But rather than engaging in "dalliance" or "delay," *Hoopa Valley*, 913 F.3d at 1104, Vermont had already publicized its concerns with the project's relicensing. Nothing in the record indicates that it needed more time to issue a certification that imposed conditions to which it had already alluded. That Vermont generously agreed to discuss necessary revisions to the project to help Morrisville avoid these conditions does not indicate its "fail[ure] or refus[al] to act" under the statute. 33 U.S.C. § 1341(a); *see N.C. Dep't of Env't Quality*, 3 F.4th at 669 (finding no section 401 waiver where "there was no idleness on the part of [the State agency]," whose staff had "met and corresponded frequently" with the applicant, including advising applicant on how to avoid certain conditions, which constituted "significant actions, . . . all taken less than a year after the certification request was filed").

Unfortunately for Morrisville, its efforts proved fruitless here. But this does not allow it to now characterize its unilateral withdrawals and resubmissions as a coordinated effort with the State. Such "gamesmanship" by licensees in which they seek to buy themselves more time to negotiate and to avoid a certification denial, and then later allege that by agreeing to their own requests the State has waived its statutory authority, would not be consistent with the statute or with our holding in

*Hoopa Valley*. *Turlock II*, 36 F.4th at 1184. Absent evidence of the State's mutual agreement with the applicant to frustrate the statutory scheme, "states' 'rights and responsibilities to ensure compliance with their own water-quality standards are too important to be so easily stripped away.'" *Cal. State Water*, 43 F.4th at 936 (quoting *N.C. Dep't of Env't Quality*, 3 F.4th at 675).

Evidence of mutual agreement with the State was lacking here. Grasping at straws in attempts to prove such coordination existed, Morrisville alleges that Vermont's accession to its requests is itself an agreement, akin to scuba diving "with a buddy" or with flying with a co-pilot. Reply Br. for Pet'r 17. Obviously, Morrisville could not withdraw and resubmit its requests without informing Vermont it was doing so. That Vermont was aware of Morrisville's decision, or even that it later informed the Commission of the withdrawal, does not make Vermont an accomplice or part of a scheme. Similarly, email signoffs from Vermont thanking Morrisville for its "cooperation" did not compel FERC to find such an agreement, Br. for Pet'r 17, especially where this was the signoff the State used from the start of the parties' interactions, before any alleged coordination could have taken place.

The Commission thus properly concluded that Morrisville acted unilaterally and out of its own self-interest to obtain more favorable conditions, rather than in coordination with the State. This finding is consistent with agency precedent. *Compare Placer Cnty.*, 169 FERC ¶ 61,046, at PP 5, 24 (finding waiver where the State agency "actively participated" in the withdrawal-and-resubmission scheme, such as by "directly requesting the withdrawal and refiling"), *with KEI (Maine) Power Mgmt. (III)*, 173 FERC ¶ 61,069 (finding no waiver where the applicant unilaterally withdrew its application to buy itself more time to negotiate with the State).

### III.     CONCLUSION

For the reasons explained above, we deny the petitions for review.

*So ordered.*